UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

JODY SCOTT ROLLER,

        Plaintiff,               Civil Action No. 3:17-cv-00010

vs.                           CHIEF JUDGE WAVERLY D. CRENSHAW, JR.

                           MAGISTRATE JUDGE PATRICIA T. MORRIS

SOCIAL SECURITY
ADMINISTRATION,

        Defendant.
_____/


**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON PLAINTIFF'S
MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD**


I.      **RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence does not

support the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT**

**IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment, (Doc. 19), be

**GRANTED**, and that this case be **REMANDED** under Sentence Four of 42 U.S.C. 405(g).

II.     **REPORT**

     A.     **Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1), Federal Rule of Civil Procedure 72, and by

Administrative Order Number 24, entered on January 23, 2018, this case was referred to

the undersigned Magistrate Judge for the purpose of reviewing a final decision by the

Commissioner of Social Security denying Plaintiff Jody Scott Roller's claim for Disability

Insurance Benefits ("DIB") under Title II, 42 U.S.C. § 401 *et seq.* The matter is currently before the Court on Plaintiff's Motion for Summary Judgment. (Doc. 19).

On February 20, 2013, Plaintiff filed an application for DIB alleging a disability onset date of June 30, 2012. (Tr. 180-83). The Commissioner denied his claim. (Tr. 67-95). Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on March 10, 2015, before ALJ Elizabeth P. Neuhoff. (Tr. 30-66). The ALJ issued a decision on May 15, 2015, finding Plaintiff not disabled. (Tr. 12-28). On November 4, 2016, the Appeals Council denied review, (Tr. 1-6), and Plaintiff filed for judicial review of that final decision on January 5, 2017. (Doc. 1). Plaintiff filed the instant Motion on May 31, 2017, (Doc. 19), and the Commissioner filed a Response on June 26, 2017, (Doc. 20), to which Plaintiff replied, (Doc. 21).

## B. Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

**C.    Framework for Disability Determinations**

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that

is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

## D.    ALJ Findings

Following the five-step sequential analysis, the ALJ found Plaintiff not disabled under the Act. (Tr. 12-28). At Step One, the ALJ found that Plaintiff would meet the insured status requirements of the SSA through December 31, 2017, and that he had not engaged in substantial gainful activity since his alleged onset date of June 30, 2012. (Tr. 17). At Step Two, the ALJ concluded that the following impairments qualified as severe: fibromyalgia, coronary artery disease, generalized anxiety disorder, and depression. (Tr. 17-18). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 18-19). Thereafter, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work, except:

> with lifting/carrying 20 pounds occasionally and 10 pounds frequently; standing/walking/sitting 6 hours total each; no work around unprotected heights; able to understand, remember and perform simple tasks and instructions; able to interact appropriately with co-workers and supervisors and infrequently with the general public; and able to adapt to change in the work setting.

(Tr. 19). At Step Four, the ALJ found Plaintiff incapable of performing his past relevant work. (Tr. 23). But proceeding to Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. (Tr. 23-24).

### E.    Administrative Record

#### 1.    Medical Evidence

The Court has reviewed Plaintiff's medical record. In lieu of summarizing his medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

#### 2.    Application Reports and Administrative Hearing

##### i.    Function Report

On February 27, 2013, Plaintiff's wife, Angel Dee Roller, filled out a Third-Party Function Report which appears in the administrative record. (Tr. 212-19). Per her description of his days, he would spend his time on the computer; he sometimes took the dog outside and smoked. (Tr. 212). He could no longer mow his yard, take walks, go fishing, or help clean, though his family helped him take care of chores. (Tr. 213). His condition did not interfere with his ability to dress, bathe, care for his hair, shave, feed himself, use the toilet, or any other personal care activities. (*Id.*). He required reminders to take his medication. (Tr. 214).

"Once in a while" Plaintiff would prepare food or meals. (*Id.*). He could also "mow a little" and "weed a little" in the yard for about ten minutes before Angel would "have to take over." (*Id.*). Plaintiff sometimes drove a car, depending "on what meds he takes." (Tr.

215). Once a month, he shopped for food. (*Id.*). He retained the capacity to handle his finances as well. (*Id.*). His hobbies included watching television and playing computer games, both of which he engaged with "[v]ery well" on a regular basis. (Tr. 216). He "[d]oesn't go out much. He is like a hermit." (Tr. 217).

Prompted to denote abilities Plaintiff struggled with, Angel marked: lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, talking, stair climbing, memory, completing tasks, and concentration. (Tr. 217). He could walk ten to fifteen steps before needing two-minutes' rest. (*Id.*). He could pay attention for up to twenty minutes at a time, and had no problems following written or spoken instructions. (*Id.*). He did not handle stress or changes in routine well. (Tr. 218).

### ii.        Plaintiff's Testimony at the Administrative Hearing

The ALJ opened the hearing with questions designed to outline some basic facts about Plaintiff's past. Plaintiff moved to Tennessee from North Carolina to take care of his ailing mother, because his father was "80 years old and he doesn't drive us at all." (Tr. 38). His alleged onset date preceded the date he filed for disability by about eight months because "I was actually trying to hopefully get squared away with my pain and my pain management so that I could go back to work with the State of North Carolina." (Tr. 39). He last worked at a restaurant as a cook in 2013, but "I left" because "they were sort of trying to help me out and I was trying to help them out and I just couldn't do the assigned tasks." (Tr. 39-40). At the time of the hearing, Plaintiff lived with his father and drove him to doctors' appointments. (Tr. 41). At times, traffic caused him anxiety. (Tr. 42).

In his free time, Plaintiff played a computer game. (*Id.*). After moving to Tennessee, Plaintiff fished with his father and "went hunting one time." (Tr. 43). While hunting, he shot a deer and field dressed it, "[b]ut it was very hard for me, so I haven't done it again to be honest." (*Id.*). Although he used to see a psychiatrist, "they asked me to write my feelings down on paper and I refused to. And he said if I didn't want to do that, or if I would not do that, then there was no need for me to come back. So, I never went back." (Tr. 44-45).

Asked why he believed he could not perform any kind of job in the economy, Plaintiff said "I don't know what I could do because when I sit for a real long time I'm miserable and I have to get up and move. If somebody starts yelling at me, I am not a very pleasant person. . . . I can't even sleep half the time because I'm so uncomfortable with my chest pains that I'm up and down, up and down" and "with little sleep, I get more aggravated." (Tr. 45). He took medication to moderate his pain. (Tr. 46). He regularly dined out in a town about twenty minutes away. (Tr. 47).

As to his education, Plaintiff said he finished high school and took several classes, but that his post-high school education did not result in any type of degree. (Tr. 47-48). The only income he brought in was "my state disability and my father's Social Security." (Tr. 48). Although he had tried to work after June 2012, his chest was "hurting so bad that I just couldn't do it." (Tr. 50). He attempted restaurant jobs, but the stress interfered with his capacity to hold the job: "The manager would come back and I'd pull a knife on him and tell him to get out of my face." (*Id.*). Even before he stopped working, he spent time

"in and out of hospitals," including a "mental hospital." (Tr. 51). His prior visit to a psychiatrist documented a suicide attempt in 2009. (Tr. 52).

He remained able to accomplish yard work, though finishing it could take up to a week. (Tr. 55). "I just physically cannot do it." (*Id.*). In addition to chest pains, he had pain travel "through his legs," though it was not "as bad as the upper portions" of his body, *i.e.*, "[r]ight below the ribs to about the neck." (Tr. 56). The doctor indicated that a combination of fibromyalgia and anxiety caused his pain; "when I get bad anxiety attacks, it's what sets off the Fibromyalgia to be worse." (*Id.*). About twice a week, he endured days in which he was "not able to do anything" to help his father. (Tr. 57). His anxiety also interfered with social activity: "I've talked to the neighbors, but I don't associate with them. I don't go to a friend's house. I don't have friends. I mean, nothing." (Tr. 58). Public outbursts sometimes occurred as well. Plaintiff described the following example:

> [W]e were at Arby's last week, and there was a lady and she had two children and the girl was not being bad, but the lady was just being terrible to the kid. I'm the type, I got up and went over and said something to her, basically, you keep pushing the kid around, I'm going to start pushing you around.

(*Id.*). He had heart procedures in the past, including catheterizations, stents, and roto-rooter services. (Tr. 60). He rarely followed up, however, because he could not afford the co-pay. (*Id.*).

### iii.      The VE's Testimony at the Administrative Hearing

The VE began by classifying Plaintiff's past work as a "truck supervisor, 909.137-018, light, SVP of 8" and "cook, 313.374-014, light, SVP of 3." (Tr. 61). The ALJ's first hypothetical posed a person able to "lift or carry 20 pounds on occasion, ten pounds

frequently. This person can sit, stand, or walk six hours total each. This person should perform no work around unprotected heights. This same person is able to understand, remember and perform both simple tasks and instructions. This person is able to maintain concentration, pace, and persistence for those tasks and instructions." (Tr. 61-62). The VE indicated that such an individual could perform Plaintiff's prior work as a cook, but not as a truck supervisor. (Tr. 62). Other potential jobs included: "assembler, small products" (8,962 local jobs and 227,477 national jobs); "prep cook" (2,612 local jobs and 118,244 national jobs); "fast food worker" (40,568 local jobs and 1,551,411 national jobs). (Tr. 62-63). The VE also clarified that "[t]hese are examples and it is not an exhaustive list." (Tr. 63).

The ALJ then presented a second hypothetical: "Let's first assume the same hypothetical person we've already been talking about, . . . This same hypothetical person can lift or carry ten pounds on occasion, and less than ten frequently. This person can sit four hours total, stand and walk two hours total each. This person would need unscheduled breaks three to four times per month, lasting 15 to 30 minutes. This person can reach 5% of the day . . . . And would miss more than four days of work per month." (Tr. 63-64). To this, the VE indicated that such a person could not perform any work. (Tr. 64).

## F.     Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.*. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996); *see also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting

objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

An ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p, 1996 WL 374186 (July 2, 1996). Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*,

749 F.2d 1066, 1071 (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1 (July 2, 1996). Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;
(v)     Treatment, other than medication, . . . received for relief of . . . pain;
(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994); SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Furthermore, the claimant's work history and the consistency of his or her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5 (July 2, 1996).

The claimant must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2). A hypothetical question to the VE is valid if it includes all credible limitations developed

prior to Step Five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993); *Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec. 9, 2009).

### G. Analysis

Plaintiff includes two arguments in the instant Motion: (1) the ALJ improperly assessed the opinion of Dr. Nicholas, Plaintiff's treating physician, (Doc. 19 at ID 617-20); and (2) the ALJ should have accorded greater weight to the opinion of Dr. Farmer, a consultative examiner, (*Id.* at ID 620-24). I address each argument in turn.

#### 1. Dr. Nicholas

Plaintiff first avers the reasons the ALJ supplied for rejecting Dr. Nicholas's opinion were not "good," requiring remand. In his view, "the ALJ's suggestion that Dr. Nicholas was not objective in his opinion is unsupported speculation," and therefore an "impermissible ground to reject his opinion." (Doc. 19 at ID 618). In addition, Plaintiff contends, "the ALJ erroneously cherry picked evidence from the record in attempt to present Dr. Nicholas's opinion as 'unsupported.' 'The ALJ is not permitted to cherry-pick the record to support her conclusions, but must instead consider the evidence taken as a whole.'" (*Id.* at ID 619) (quoting *Satterfield v. Colvin*, No. 3:11-1225, 2016 WL 367903, at *7 (M.D. Tenn. Jan. 28, 2016), *R.& R. adopted*, No. 3:11-CV-01225, 2016 WL 727629 (M.D. Tenn. Feb. 24, 2016)).

Evaluating medical source statements requires considering factors such as the nature of the source's examining relationship with the client, 20 C.F.R. § 416.927(c)(1), the source's treatment relationship with the client, *id.* § (c)(2), the supportability of the source's

opinion, *id.* § (c)(3), the consistency of the opinion with the record as a whole, *id.* § (c)(4), whether the source is a specialist opining on areas within her specialty, *id.* § (c)(5), as well as "any factors" the claimant or others "bring to [the Commissioner's] attention, or of which [the Commissioner] is aware, which tend to support or contradict the opinion," *id* § (c)(6). The ALJ "will always give good reasons. . . for the weight" given a "*treating source's opinion.*" *Id* § (c)(2) (emphasis added). The ALJ, however, need not give 'good reasons' with respect to 'other sources'—rather, he "generally should explain the weight given to opinions from . . . 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). There remains an important "distinction between what an adjudicator must consider and what the adjudicator must explain." *Id.*

The ALJ provided good reasons to discount Dr. Nicholas's findings. As she noted, Dr. Nicholas's findings do not seem to follow from his treatment notes. (Tr. 22). *Compare* (Tr. 286-87), *with* (Tr. 274-285, 290-95). Plaintiff takes issue with the ALJ's statement that Dr. Nicholas's opinion "might have been drafted in an attempt to assist the claimant in his disability application," (Tr. 22), and this concern is warranted. *See Allen v. Astrue*, No. 3:12-CV-4, 2013 WL 958306, at *4 (E.D. Tenn. Mar. 12, 2013) ("The ALJ's opinion thus gives the appearance that rather than objectively consider the record as a whole and the treatment relationship of Dr. Bridgeman and plaintiff, he speculated about the lack of legitimacy of Dr. Bridgeman's opinion and allowed that speculation to in party lead him to

the conclusion to give the opinion no weight."); *Voyles v. Astrue*, No. CIV.A. 10-175-GWU, 2011 WL 1326936, at *4 (E.D. Ky. Apr. 5, 2011) (finding a "suspicion that the doctor based his findings on sympathy" to be "unsupported speculation" and "an impermissible ground" to reject a treating source's opinion). However, the ALJ furnished citations to the record in support of her finding that Dr. Nicholas's RFC lacked support and remained inconsistent with the remainder of the record, and these citations were sufficiently specific and well-supported to counteract any implication that her pontification as to Dr. Nicholas's motives impacted her weight assignment. (Tr. 20-22); *e.g.*, (Tr. 138-39, 243-44, 249-50, 261-62, 265-66, 276, 278, 280-81, 285, 290, 292, 294-95, 298, 300, 310-11, 316-18, 325-26, 331, 344, 365, 400, 413, 444, 479, 482, 484, 503, 507-09, 516, 523, 528, 535, 543-44, 547-48) (largely normal physical findings, aside from trigger points consistent with fibromyalgia); (Tr. 176, 295, 303, 542, 545, 548-49) (denying side-effects from medication); (Tr. 275-76, 280, 282, 284, 292, 294-95, 302-03) (medication significantly reduced pain); (Tr. 213, 272, 309, 546) (robust activities of daily living). In other words, the ALJ's ill-advised editorializing—albeit made in error—did not harm Plaintiff.

For these reasons, substantial evidence bolsters the ALJ's assignment of little weight to Dr. Nicholas's opinion. On remand, however, the ALJ would be well-advised to scrub any hint of the speculation identified above from her opinion.

### 2. Dr. Farmer

Respecting the ALJ's treatment of Dr. Farmer's opinion, Plaintiff gestures toward several alleged errors. At the outset, he suggests the ALJ should not have weighed "the

absence of specialized mental health treatment" against Dr. Farmer's findings. (Doc. 19 at ID 621). Such an absence may be indicative of mental illness, and as Plaintiff points out, he "treated with medications through his primary care provider, taking Xanax, Remeron, and Tradozone." (*Id.* (citing (Tr. 271-72))). In addition, Plaintiff says the ALJ's underlying rationale for her weight assignment was "unduly vague and fails to explain why she rejected certain findings." (*Id.* at ID 622). "[T]he ALJ failed to actually assert any evidence that contradicts Dr. Farmer's opinion of Plaintiff's judgment, social functioning, or difficulty dealing with daily stress." (*Id.*). Lastly, Plaintiff argues that the "ALJ failed to consider the supportability of Dr. Farmer's opinion based upon his personal examination and clinical findings, in violation of the regulations." (*Id.* at ID 623).

Dr. Farmer was not a treating physician, and the ALJ did not need to supply good reasons for her weight-assignment. *E.g.*, *Miller v. Comm'r of Soc. Sec.*, No. 4:13-CV-90, 2015 WL 630386, at *9 (E.D. Tenn. Feb. 11, 2015) ("The ALJ . . . had no obligation to provide good reasons for discounting Dr. Brandau's opinion as a consultative examiner, . . ."). In considering a non-treating source, the ALJ need only "ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p, 2006 WL 2329939, at *6 (S.S.A. Aug. 9, 2006). At first glance, the ALJ ostensibly fulfilled this obligation by noting that Plaintiff regularly presented with a normal mood and affect, ceased taking psychotropic medication, and demonstrated an ability to interact appropriately and concentrate. (Tr. 21-22); *e.g.*, (Tr. 239, 257, 262, 344, 353, 365, 400, 414, 444, 509, 516, 528, 535, 544, 548) (normal mood, affect, or mental

status); (Tr. 215-16, 272-73) (regularly engaged in activities requiring concentration); *see also* (Tr. 238, 243-44, 250, 257, 261, 265, 278, 281, 290, 292, 298, 300, 302, 310, 344, 353, 387, 400, 413, 444, 484, 523, 535) (alert and oriented); (Tr. 273) ("Mr. Roller presents as capable of understanding, retaining, and following instructions. . . . His ability to relate to others, including fellow workers and supervisors may be *somewhat* limited due to his mood disturbance and irritability. His ability to tolerate stress and pressures associated with day-to-day work activity is limited for the same reasons." (emphasis added)). The ALJ did not flatly reject Dr. Farmer's opinion, but assigned it "some weight" after discussing Plaintiff's alleged mental condition at length. (Tr. 22). Her RFC also limited Plaintiff to "simple tasks and instructions" and "infrequent[]" contact with the general public, in accordance with record evidence she considered. (Tr. 19).

Plaintiff's specific argument that the ALJ should not have weighed his failure to seek mental-health treatment against Dr. Farmer's opinion, however, remains meritorious. Failure to seek mental-health treatment may certainly be relevant to the accuracy of a source's opinion or a claimant's statements, provided the record contains no indication that this failure arose as a symptom of the condition. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 283-84 (6th Cir. 2009) (finding that, although lack of mental-health treatment may signal the existence of a disorder, such lack of treatment may also "indicate[] an allevation of . . . symptoms" when "no evidence in the record" suggests the former). Nevertheless, "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Blankenship v. Bowen*, 874 F.2d

1116, 1124 (6th Cir. 1989). In the instant case, the ALJ's consideration of Plaintiff's lack of mental health treatment is wanting in several respects.

In summarizing Plaintiff's medical history, for instance, the ALJ misconstrued a key portion of testimony in her discussion of Plaintiff's background. She wrote, "He could handle the speed of [his restaurant] job at times, but if he could not, the manager would come back there 'with a knife.' That is when he stopped working there." (Tr. 20). In fact, Plaintiff testified that when he could not handle the speed of that job, "[t]he manager would come back and *I'd pull a knife on him* and tell him to get out of my face." (Tr. 50) (emphasis added). This mistake is significant, as it overlooks a specific (and troubling) instance of antagonistic conduct, which Plaintiff alluded to at other points in his testimony, and which reasonably could be seen as interfering with his motivation to seek treatment. (Tr. 45) ("I respond very badly [to social pressure]. Not proud moments in my life, I . . . don't know how to process it."); (Tr. 58) ("[T]he lady was just being terrible to the kid. I'm the type, I got up and went over and said something to her, basically, you keep pushing the kid around, I'm going to start pushing you around."). These passages document decidedly anti-social behavior, and the ALJ does not mention any them.

The record also suggests that Plaintiff avoided psychiatric treatment and medication in general because of a prior bad experience with therapy following his attempted suicide in 2009 and his general feeling of hopelessness regarding treatment. (Tr. 44-45) ("I stopped seeing a psychiatrist . . . when they asked me to write my feelings down on paper and I refused to. And he said if I didn't want to do that, or if I would not do that, then there was no need for me to come back. So, I never went back."); (Tr. 46) (testifying he did not know

whether psychotropic medication helped and "I just can't afford it"); (Tr. 273) ("Mr. Roller is definitely in need of psychotherapy in addition to medication management."). Yet in addressing the medical evidence relating to Plaintiff's mental health, the ALJ did not discuss these portions of the record in any depth at all. Tellingly, when discounting his allegations as to the severity of his mental conditions, she only mentions his ability to concentrate and his ability to go to restaurants with his father, as well as the fact that his "treating doctors have repeatedly indicated that his mood and affect are normal." (Tr. 21-22).

Coupling this dearth of discussion with the ALJ's misreading of Plaintiff's testimony reveals fatal flaws in her calculation that no evidence in the record explained Plaintiff's failure to seek treatment. This error, in turn, implicates the ALJ's weight assignment to Dr. Farmer, which recommended more severe limitations than those the ALJ included in her RFC assessment. *See Albanna v. Comm'r of Soc. Sec.*, No. 15-CV-14264, 2016 WL 7238925, at *13 (E.D. Mich. Nov. 22, 2016), *R. & R. adopted,* No. 15-14264, 2016 WL 7210715 (E.D. Mich. Dec. 13, 2016) (remanding because the ALJ "declined to meaningfully grapple with" possible explanations for the plaintiff's failure to seek mental-health treatment); *cf. Duvall v. Comm'r of Soc. Sec.*, No. CV 16-11902, 2017 WL 2838351, at *11 n.9 (E.D. Mich. Apr. 28, 2017), *R. & R. adopted,* No. 16-CV-11902-DT, 2017 WL 2857491 (E.D. Mich. June 30, 2017) (remanding because of "the ALJ's reliance on . . . misinterpreted testimony in support of the RFC" from the VE); *Price v. Comm'r of Soc. Sec.*, No. 2:15-CV-3044, 2016 WL 6872309, at *5 (S.D. Ohio Nov. 22, 2016) (remanding because the ALJ misunderstood a treating source opinion, and thus "could not have

considered it correctly"). This Court is incapable of weighing the evidence discussed above on the ALJ's behalf, and therefore remand is required. *E.g.*, *Mullins v. Sec'y of Health & Human Servs.*, 680 F.2d 472, 472 (6th Cir. 1982) ("Our task is not to reweigh the evidence. That is solely the province of the Secretary."); *Weaver v. Comm'r of Soc. Sec.*, No. 3:13-CV-713, 2015 WL 64873, at *8 (E.D. Tenn. Jan. 5, 2015) ("'While an ALJ need not discuss every piece of evidence,' he must investigate and consider the evidence in its entirety, especially critical pieces of evidence." (quoting *Oliver v. Comm'r of Soc. Sec.*, No. 07-15475, 2010 WL 1002618, at *10 (E.D. Mich. Mar. 2, 2010))).

Because substantial evidence does not support the ALJ's assignment of only some weight to Dr. Farmer's opinion, remand is required on this ground.[1]

---

[1] I note, as well, that the ALJ should take care in addressing Plaintiff's fibromyalgia on remand. The ALJ's opinion makes no mention of SSR 12-2p, 2012 WL 3104869, at *6 (July 25, 2012), in which the SSA guarantees "we will consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" Courts in the Sixth Circuit, recognizing the unique nature of fibromyalgia and its varied symptoms, tend to encourage an express discussion of medical records and conditions as they relate to fibromyalgia. *E.g.*, *Arnold v. Colvin*, No. 3:13-CV-00197, 2016 WL 4560122, at *6 (M.D. Tenn. Sept. 1, 2016), *R. & R. adopted,* No. 3:13-CV-00197, 2016 WL 6038040 (M.D. Tenn. Oct. 14, 2016) ("Although the ALJ discussed Plaintiff's medical records and complaints of pain, the ALJ did not specifically discuss Plaintiff's fibromyalgia, and the ALJ's decision is unclear as to whether the ALJ considered these records and complaints as they relate to Plaintiff's fibromyalgia."). This is so even though SSR 12-2p "merely provides guidance on how to apply pre-existing rules when faced with a claimant asserting disability based on fibromyalgia." *Luukkonen v. Comm'r of Soc. Sec.*, 653 F. App'x 393, 399 (6th Cir. 2016); *see Riddle v. Comm'r of Soc. Sec.*, No. 17-10905, 2018 WL 822428, at *3 (E.D. Mich. Feb. 12, 2018) ("While the ALJ did consider the general factors required in determining an RFC, this does not mean that the ALJ applied SSR 12-2p. The ALJ does not reference or cite SSR 12-2p. The Ruling requires the ALJ give special consideration to unique features of fibromyalgia which the ALJ never appeared to consider.").

### H.    Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Plaintiff's Motion for Summary Judgment, (Doc. 19), be **GRANTED**, and that this case be **REMANDED** under Sentence Four of 42 U.S.C. 405(g).

## III.    <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ.

P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: February 28, 2018

S/ PATRICIA T. MORRIS
PATRICIA T. MORRIS
UNITED STATES MAGISTRATE JUDGE
SITTING BY SPECIAL DESIGNATION